**FAEGRE DRINKER BIDDLE & REATH LLP**
Helen E. Chacon (CA SBN: 293067)
1950 University Ave, Suite 450
East Palo Alto, CA 94303-2279
Telephone: (650) 324-6700
Facsimile:  (650) 324-6701
Email: helen.chacon@faegredrinker.com

R. Trevor Carter (*pro hac vice*)
Reid E. Dodge (*pro hac vice*)
300 North Meridian Street, Suite 2500
Indianapolis, IN 46024-1750
Telephone: (317) 237-0300
Facsimile: (317) 237-1100
Email: trevor.carter@faegredrinker.com
Email: reid.dodge@faegredrinker.com

JD Schneider (*pro hac vice*)
1144 15th Street, Suite 3400
Denver, CO 80202
Telephone: (303) 607-3500
Facsimile: (303) 607-3600
Email: jd.schneider@faegredrinker.com

*Counsel for Plaintiff Linquet Technologies, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINQUET TECHNOLOGIES, INC., | Case No.: 3:20-cv-05153-JD |
| *Plaintiff,* | |
| *v.* | **SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT** |
| TILE, INC., | |
| *Defendant.* | **DEMAND FOR JURY TRIAL** |
| | **Judge: Hon. James Donato**<br>**Courtroom: 11, 19th Floor** |

Pursuant to the Court's September 15, 2021 Order (ECF No. 68) granting leave to file an amended complaint, Plaintiff Linquet Technologies, Inc. ("Linquet"), submits its Second Amended Complaint against Defendant Tile, Inc. ("Tile"), and alleges as follows:

## I.      NATURE OF THE ACTION

1.      This is a civil action for infringement of U.S. Patent No. 10,163,318 (the "'318 Patent").  A true and correct copy of the '318 Patent is attached hereto as Exhibit A.

## II.      THE PARTIES

2.      Linquet realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraph 1, above.

3.      Linquet is a corporation organized and existing under the laws of Canada with a principal place of business at 2604-950 Cambie St., Vancouver, British Columbia.

4.      Upon information and belief, Tile is a privately held company, incorporated and organized under the laws of the State of Delaware.  Tile is registered and conducts business in the State of California with a principal place of business at 2121 South El Camino Real, Suite 900, San Mateo, California 94403.

## III.      JURISDICTION AND VENUE

5.      Linquet realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1–4, above.

6.      This Court has exclusive subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7.      Venue is proper in this District under 28 U.S.C. § 1400(b).  Tile has committed acts of patent infringement complained of herein in this District, and Tile has a regular and established place of business in this District.

8.      This Court has personal jurisdiction over Tile.  Tile's principal place of business is in this District, and Tile regularly conducts business in this District.  Tile has purposefully availed itself of the privilege of conducting activities within this District, and Tile's activities in this District are continuous and systematic and give rise to the liabilities sued upon herein. On information and belief, Tile's activities in this District include, *inter alia*, making, selling, and/or offering to sell infringing

1

SECOND AMENDED COMPLAINT FOR PATENT
INFRINGEMENT

products in this District, and marketing and advertising infringing products in this District. On information and behalf, Tile does extensive business within the State of California and this District and earns substantial revenue through its contacts with this District.

## IV.  FACTUAL BACKGROUND

9.      Linquet realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1–8, above.

### A. *Background on Linquet*

10.      Founded in 2010, Linquet is an innovator in location technologies solutions, including, in particular, cloud-based/community-powered solutions for locating and protecting mobile devices, keys, pets, luggage, and other items.

11.      In April 2012, Linquet released the first cloud-based solution for protecting and tracking mobile devices and other items.  Public praise for Linquet's innovative solution was swift and widespread, with positive press in publications including the Huffington Post, Techvibes, and TheNextWeb, and, soon thereafter, the New York Times and CNBC.

12.      Linquet currently offers its innovative products and services for sale online (www.linquet.com) and through various third parties.  In addition, the Linquet app is available for iOS and Android devices through the Apple and Google app stores.

13.      Linquet's innovative solution permits users to attach Linquet tags to items (*e.g.,* keys, wallets, luggage, pets, etc.) they wish to protect and locate.  When the tag attached to the owner's item goes out-of-range, the owner's mobile device and/or tag attached to the item alarm, preventing the owner from forgetting or losing/misplacing the item.  In addition, Linquet uploads the time and location to the cloud in real-time, giving the owner the ability to locate the item at a later time.  Using the Linquet network, if another Linquet user passes within range of a tag attached to a misplaced item, the item's location will be automatically, anonymously, and securely uploaded to the cloud, and the owner can be notified.  Furthermore, a tag attached to an item is privately detectable by another Linquet user's mobile device when the tag is out-of-range of the owner's mobile device, greatly increasing the privacy, efficiency, and scalability of Linquet's innovative solution.

1

2      **B.   *The '318 Patent***

3           14.     Linquet has invested heavily in developing its innovative cloud-based solution to

4      protect and locate items.  In doing so, Linquet has acquired an array of intellectual property rights,

5      including but not limited to multiple patent rights for its innovations.  Those patents include, for

6      example, the '318 Patent, which are and have been published at https://linquet.com/patents since at

7      least December 25, 2018, thereby complying with the marking requirements of 35 U.S.C. § 287.

8           15.     The '318 Patent, entitled "COMPREHENSIVE SYSTEM AND METHOD OF

9      UNIVERSAL REAL-TIME LINKING OF REAL OBJECTS TO A MACHINE, NETWORK,

10     INTERNET, OR SOFTWARE SERVICE," was duly and legally issued to Mr. Pooya H. Kazerouni

11     on December 25, 2018.  Mr. Kazerouni is the founder of Linquet and currently serves as its President.

12          16.     The '318 Patent includes claims, including at least claims 1 and 2, that cover Linquet's

13     innovative products and services for sale online (www.linquet.com) and through various third parties.

14          17.     Claim 1 of the '318 Patent recites:

15     A system for detecting placement or misplacement of an object, the system
16     comprising:

17     a wireless tag associated with the object;

18     a first set of instructions stored in a first non-transitory storage medium, the first
       set of instructions, when executed by one or more processors in a first electronic
19     device associated with the wireless tag, cause the one or more processors in the first
       electronic device to automatically:
20

21          detect one or more signals from the wireless tag;

22          determine a position of the first electronic device;

23          determine a status of the wireless tag in response to a strength or absence of the
            one or more signals detected by the first electronic device, the status indicating
24          that the wireless tag and the first electronic device are within a predetermined
            range or that the wireless tag and the first electronic device are outside the
25          predetermined range;

26          transmit the position of the first electronic device and the status to an external
            electronic device in response to the status indicating that the wireless tag and
27          the first electronic device are within the predetermined range; and

28

3

transmit the position of the first electronic device and the status to the external electronic device in response to the status indicating that the wireless tag and the first electronic device are outside of the predetermined range;

a second set of instructions stored in a second non-transitory storage medium, the second set of instructions, when executed by one or more processors in a second electronic device that is unassociated with the wireless tag, cause the one or more processors in the second electronic device to automatically:

detect one or more signals from the wireless tag;

determine a position of the second electronic device;

determine an identifier for the wireless tag using the one or more signals from the wireless tag; and

transmit the position of the second electronic device and the identifier to the external electronic device.

18.     Claim 2 of the '318 Patent, which depends on claim 1, recites:

The system of claim 1, wherein the wireless tag includes a controller configured to:

monitor signals communicated with the first electronic device;

determine, in response to a strength or absence of signals communicated with the first electronic device and the wireless tag, that the wireless tag and the first electronic device are within a predetermined range or that the wireless tag and the first electronic device are outside the predetermined range; and

render the wireless tag detectable by the second electronic device in response to determining that the wireless tag and the first electronic device are outside the predetermined range.

19.     Dr. Daniel W. Engels, the current Head of AI, Cyber Security Science and Analytics for the Hong Kong and Shanghai Banking Corporation ("HSBC") in London, UK., and Research Fellow at the Southern Methodist University ("SMU") AT&T Center for Virtualization has opined that the Asserted Claims are directed to patent eligible subject matter.

20.     On information and belief, at the time of the '318 Patent, there existed, for example, no privacy-preserving, scalable, cloud-based, community-powered solutions for protecting and locating mobile devices, keys, luggage, pets, and other items, as claimed and disclosed in the '318 Patent, including as claimed in at least claims 1 and 2 of the '318 Patent. (Ex. F, Engels Decl. ¶ 23.) Indeed, the lack of these systems, and more particularly the problems prior art systems exhibited with

regard to privacy, efficiency, and scalability that were issues that Dr. Engels himself struggled to deal with within this field:

> Prior to the '318 Patent, there existed no privacy-preserving, scalable, cloud-based, community-powered solutions for real-time linking, protecting, tracking, and locating mobile devices, keys, luggage, pets, and other items. To be clear, and as reflected in my background (*supra* § II), I was an active participant in the IoT devices and communications, cloud services, and location services industries, and the lack of privacy-preserving, efficient, and scalable functionalities within networks were real technological problems facing the industry prior to the '318 Patent. For example, the EPC system I developed (and discussed above) dealt with these technological problems, but within the realm of supply chain management. For example, the EPC system had *privacy* concerns, as the RFID tags involved in the system would respond to all reader-devices that sent out an interrogation signal. This allowed all reader-devices to obtain information from the tags within the system, thereby allowing the track and trace of the tags (and, therefore, the objects associated with those tags) under certain circumstances. In addition, the EPC system dealt with *scalability* concerns, as the reader-devices were required to be within a certain threshold distance of the RFID tags in order to function. Thus, in the supply chain management application, the reader-devices could, for example, determine whether a tagged object was within a building or not, but could not provide further location information once the tag had left the building, or even the read-zone of the reader-device. Additionally, and relatedly, the EPC system ran into *efficiency* concerns. For example, the reader-devices routinely transmitted signals to all tags within range regardless of circumstance. Said another way, the technology required the reader-devices to be in constant communication with all tags for perfect visibility. This constant communication increased the volume of data that the system had to manage. In doing so, the system incurred increased energy consumption, as well as increased bandwidth, processing power, and storage constraints. Moreover, this decreased efficiency also played a role in limiting the overall scale of the system.

(Ex. F, Engels Decl. ¶ 23.)

21.     For example, the prior system depicted in U.S. Patent Publ. No. 2010/0289646 to Raniere, that the Examiner of the '318 Patent identified as being the "closest prior art" to the '318 Patent, (*see* Ex. D, Oct. 4, 2018, Notice of Allowability, at 2–4, 8; *see also* Ex. F, Engels Decl. ¶ 24), is **not scalable**, as it includes only a single user tracking his/her own objects. (*See e.g.*, Ex. E, Raniere [0043], [0060]; Ex. F, Engels Decl. ¶ 27.) Indeed, Raniere's system is designed to be single-user centric; there is no intended community sourcing and/or automatic sharing of information. (*See* Ex. E, Raniere [0043], [0060]; Ex. F, Engels Decl. ¶ 27.) As a result, while the system in Raniere may "generate a warning notification capable of notifying a user when certain ones of the tagged objects

are not detected within a predetermined proximity distance" of their device, the system does not provide for further tracking and location of an object, for example, by the use of other devices, such as those in the surrounding community, once it has left the predetermined proximity threshold. (Ex. E, Raniere [0067]; Ex. F, Engels Decl. ¶ 27.) Instead, a user must wait until "certain ones of the tagged objects reenter within a predetermined proximity distance threshold" before the user can resume tracking an object. (Ex. E, Raniere [0067]; Ex. F, Engels Decl. ¶ 27.) In short, Raniere allows for the tracking and location of a tagged object within a limited predetermined distance of a particular user, but once the tagged object has left that threshold, the tagged object can no longer be tracked until the object reenters the predetermined proximity distance of that user. (Ex. F, Engels Decl. ¶ 27.)

22. Moreover, the Raniere prior system suffers from another technical problem: it is **inefficient**. (Ex. F, Engels Decl. ¶ 28.) Specifically, the specification makes clear that Raniere's system involves a device that "regularly transmit[s] an interrogation signal to the tags" within communication range, in order to "maintain[] a list of [tagged] objects nearby." (Ex. E, Raniere [0057]; Ex. F, Engels Decl. ¶ 28.) By "regularly transmitting an interrogation signal" to all tags within communication range, Raniere's system is consuming excess energy and utilizing excess network bandwidth and processing power on communications with tags of no consequence to the device or its user. (Ex. E, Raniere [0057]; Ex. F, Engels Decl. ¶ 28.) A person of ordinary skill in the art ("POSA") would understand that as more tags of no consequence to the device entered the device's communication range, more energy, bandwidth, and device resources would be used to communicate with each of these tags. (Ex. F, Engels Decl. ¶ 28.) Furthermore, a POSA would understand that the device used in Raniere would need to record each of these regular transmissions, leading to an increase in the required processing power needed, the system's storage constraints, and its energy consumption. (Ex. E, Raniere [0057], [0058]; Ex. F, Engels Decl. ¶ 28.) Relatedly, because the devices in Raniere locally maintain "a list of objects nearby (*i.e.*, within communication range)," the system further strains storage constraints on the user's device, particularly when large numbers of tags of no consequence to the device are within communication range. (Ex. E, Raniere [0057], [0068]; Ex. F, Engels Decl. ¶ 28.) Not only does this decrease the efficiency of the system as whole, but in doing so, Raniere's inefficiency limits the system's ability to scale. (Ex. F, Engels Decl. ¶ 28.) A POSA further

6

understood that this inefficiency is compounded when multiple devices that communicate to tags operate within the same communication areas, as only one of these devices could operate successfully at any time in communication with a given tag. (Ex. F, Engels Decl. ¶ 28.) Since every tag must be individually communicated with by every device, (Ex. E, Raniere [0057], [0061]), the device resources consumed, and time required to operate, increase proportionately to the number of other devices operating within the same communication area. (Ex. F, Engels Decl. ¶ 28.)

23.     Additionally, a POSA understood the **privacy concerns** inherent in scaling such a system involving various unrelated users. (Ex. F, Engels Decl. ¶ 29.) In particular, and as mentioned above, the system depicted in Raniere involves a device that "regularly transmit[s] an interrogation signal to the tags." (Ex. E, Raniere [0057]; Ex. F, Engels Decl. ¶ 29.)  In response, each tag within the system "may generate a response signal in response to an interrogation signal." (Ex. E, Raniere [0061]; (Ex. F, Engels Decl. ¶ 29.) This "response may include the unique identification code associated with the RFID tag," allowing all devices to "identify the unique tag 80." (Ex. E, Raniere [0061]; (Ex. F, Engels Decl. ¶ 29.)  Consequently, a third party using a device that "regularly transmits interrogation signals" may track and trace tags belonging to other users. (*See, e.g.*, Ex. E, Raniere [0057]; Ex. F, Engels Decl. ¶ 29.) And, upon sending an interrogation signal from their device, the tag will provide information concerning the tag, such as its existence within communication range of another user's device, or its "unique identification code." (Ex. E, Raniere [0061]; (Ex. F, Engels Decl. ¶ 29.)

24.     It was exactly these technological problems—scalability, efficiency, and privacy—that were solved when Mr. Kazerouni invented the novel system claimed and disclosed in the '318 Patent. (Ex. F, Engels Decl. ¶¶ 24, 53-57, 62-64, 67-74.)

25.     As set forth in the claims, and as the '318 Patent's specification explains, in one embodiment, a wireless tag is attached to an object such as a wallet.  (*See, e.g.,* '318 Patent, 8:54-56, claim 1; *see also* Ex. F, Engels Decl. ¶ 38.)  A first electronic device that is associated with the tag, *e.g.*, the owner's cellular phone, communicates with the tag using radio signals.  (*See, e.g.,* '318 Patent, 8:46-47, 8:56-58, claim 1; *see also* Ex. F, Engels Decl. ¶ 38.)  By monitoring the signals, the phone determines the status of the tag, *i.e.*, whether the tag is "in-range" of the phone or "out-of-range" of the phone. (*See, e.g.,* '318 Patent, 8:58-67, claim 1; *see also* Ex. F, Engels Decl. ¶ 38.)  When the tag

7

becomes in-range or out-of-range, the phone automatically transmits its position and the status of the tag to an external electronic device such as an "external network or cloud data service." (*See, e.g.,* '318 Patent, 9:3-11, claim 1; *see also* Ex. F, Engels Decl. ¶ 38.)

26.     In addition, a second phone that is unassociated with the tag, *e.g.*, a phone that belongs to a stranger, can detect signals from the tag and transmit the stranger's phone's location and identifier of the tag to the cloud under certain conditions. (*See, e.g.,* '318 Patent, 27:42-52, claim 1; *see also* Ex. F, Engels Decl. ¶ 39.) This allows the owner of the tag to determine the tag's location even when the tag is not in contact with the owner's phone. (*See, e.g.,* '318 Patent, 27:52-57, claim 4; *see also* Ex. F, Engels Decl. ¶ 39.) Furthermore, a controller in the tag can be configured to monitor signals from the owner's phone so that only when the tag is out-of-range of the owner's phone does the tag become detectable by a stranger's phone. (*See, e.g.,* '318 Patent, 27:42-52, claim 2; *see also* Ex. F, Engels Decl. ¶ 39.)

27.     Accordingly, the claims set out meaningful requirements for when devices and tags communicate with one another, thereby limiting the system to rules with specific characteristics, not an abstract idea. (Ex. F, Engels Decl. ¶ 46.) In doing so, the specific structure outlined by the claim limitations prevents broad preemption of all tracking and location systems. (Ex. F, Engels Decl. ¶ 46.)

28.     In particular, claim 1 provides a variety of meaningful and specific requirements with respect to the "first electronic device" and the "wireless tag." (Ex. F, Engels Decl. ¶ 47.) Specifically, claim 1 requires that a "first electronic device" be "associated" with a "wireless tag" and include a unique "first set of instructions." ('318 Pat., claim 1; *id.*, abstract, 9:24-31, 18:5-6, 23:66-24:1; Ex. F, Engels Decl. ¶ 47.) Only when this unique "first set of instructions" is "executed" (*e.g.*, when a user is logged in and the application is running) will the "first electronic device associated with a wireless tag" cause the "first electronic device" to "automatically" perform the following specific tasks: (1) "detect one or more signals from the wireless tag"; (2) "determine a position of the first electronic device"; (3) "determine a status of the wireless tag in response to a strength or absence of the one or more signals detected by the first electronic device, the status indicating that the wireless tag and the first electronic device are within a predetermined range or…outside the predetermined range"; and (4) "transmit the position of the first electronic device and the status to an external electronic device in

8

1  response to the status indicating that the wireless tag and the first electronic device are within" or
2  "outside of the predetermined range." ('318 Pat., claim 1; *id*., abstract, 8:58-9:14; Ex. F, Engels Decl.
3  ¶ 47.)

4         29.    Additionally, claim 1 further provides a variety of meaningful and specific
5  requirements with respect to the "second electronic device" and the "wireless tag." (Ex. F, Engels
6  Decl. ¶ 47.)   Specifically, claim 1 further requires that a "second electronic device," that is
7  "unassociated" with the "wireless tag" include a unique "second set of instructions." ('318 Pat., claim
8  1; *id*., Abstract, 27:46-51; Ex. F, Engels Decl. ¶ 47.) When this unique "second set of instructions" is
9  "executed," the claims allow the "second electronic device" to "automatically" perform its own
10  specialized tasks: (1) "detect one or more signals from the wireless tag"; (2) "determine a position of
11  the second electronic device"; (3) "determine an identifier for the wireless tag using the one or more
12  signals from the wireless tag"; and (4) "transmit the position of the second electronic device and the
13  identifier to an external electronic device." ('318 Pat., claim 1; *id*., abstract, 27:46-57; Ex. F, Engels
14  Decl. ¶ 47.)

15         30.    The limitations of claim 2 add even further specialized requirements to claim 1. (Ex.
16  F, Engels Decl. ¶ 48.) Specifically, claim 2 requires that the "wireless tag" used throughout the system
17  include a "controller." ('318 Pat., claim 2; *id.*, 12:30-39; Ex. F, Engels Decl. ¶ 48.) Similar to the
18  unique sets of instructions in claim 1, the controller found within wireless tags is "configured" to
19  perform specific functions, including the following three tasks: (1) "monitor signals communicated
20  with the first electronic device";  (2) "determine, in response to a strength or absence of signals
21  communicated with the first electronic device and the wireless tag, that the wireless tag and the first
22  electronic device are within a predetermined range or…outside the predetermined range"; and,
23  importantly, (3) "render the wireless tag detectable by the second electronic device in response to
24  determining that the wireless tag and the first electronic device are outside the predetermined range."
25  ('318 Pat., claim 2; *id.*, abstract, 12:40-13:4, Fig. 1B, Ex. F, Engels Decl. ¶ 48.)

26         31.    By reciting the timing and type of information and communications in the system with
27  specificity, the claims are limited to rules with specific characteristics. (Ex. F, Engels Decl. ¶ 49.) For
28  example, the "first electronic device" performs certain tasks "automatically" under certain conditions

9

(*e.g.*, only when "associated" with a tag, only when unique "first set of instructions" are executed, etc.) and recites the functions the "first electronic device" performs with specific information in those tasks once executed (*e.g.*, "signals from the [associated] wireless tag," "determine a position of the first electronic device," etc.). (Ex. F, Engels Decl. ¶ 49.) Likewise, the "second electronic device" also performs certain tasks "automatically" under certain conditions (*e.g.*, only when "unassociated" with a tag, only when unique "second set of instructions" are executed, etc.) and recites the functions the "second electronic device" performs with specific information in those tasks once executed (*e.g.*, "signals from the [unassociated] wireless tag," "determine a position of the second electronic device," etc.). (Ex. F, Engels Decl. ¶ 49.) Finally, the "controller" within the claimed "wireless tag" does not "render the wireless tag detectable by the second electronic device" until certain conditions have been met (*e.g.*, only when "monitor[ing] signals communicated with the first electronic device," only when the controller "determine[s], in response to a strength or absence of signals communicated with the first electronic device and the wireless tag," that "the wireless tag and the first electronic device are outside the predetermined range"). (Ex. F, Engels Decl. ¶ 49.) If these requirements have not been met, the wireless tag will not be "detectable" to the claimed second electronic device. (Ex. F, Engels Decl. ¶ 49.)

32.    Importantly, these specifically claimed rules and requirements result in the increased scalability and efficiency of the system as a whole, which improves upon and addresses technological problems that existed in the prior art. (*Supra* ¶¶ 19-23; Ex. F, Engels Decl. ¶ 50.) Moreover, these specifically claimed rules and requirements confirm that the '318 Patent claims are not directed to an abstract idea because the claims do not abstractly cover results regardless of the process or machinery by which the results are accomplished. (Ex. F, Engels Decl. ¶ 50.)

33.    In addition, the specifically claimed rules and requirements result in a system that is more efficient than—and, thus, results in improved functionality—over prior art systems. (Ex. F, Engels Decl. ¶ 51.) As noted above, (*supra* ¶ 29), prior art tracking solutions presented unique problems, including energy consumption, as well as storage, bandwidth and processing constraints of the devices used in the network. (Ex. F, Engels Decl. ¶ 51.) By improving the functionality of these

1   devices, the claimed and disclosed system addressed these technical problems, which resulted in a

2   more efficient and scalable system. (Ex. F, Engels Decl. ¶ 51.)

3       34.    In particular, with respect to claim 1, for example, instead of systems that regularly

4   transmit an interrogation signal between all devices and all tags, the '318 Patent system limits such

5   communication to specific conditions and recites the types of information communicated and

6   exchanged. (Ex. F, Engels Decl. ¶ 52.) To do this, the '318 Patent system (and the claim limitations)

7   requires the "first electronic device" to be "associated" with the "wireless tag." ('318 Patent, claim 1;

8   *id.*, abstract, 18:5-7, 23:66-24:1; Ex. F, Engels Decl. ¶ 52.)  Moreover, claim 1 requires that the first

9   electronic device contain a unique "first set of instructions." ('318 Patent, claim 1; *id.*, abstract, 9:24-

10  31; Ex. F, Engels Decl. ¶ 52.) Not only must this "first set of instructions" be "executed" for the first

11  electronic device to "automatically" accomplish its tasks, but the claims specifically recite the

12  functions the "first electronic device" performs with specific information: (1) "detect[ing] one or more

13  signals from the wireless tag"; (2) "determine[ing] a position of the first electronic device"; (3)

14  "determine[ing] a status of the wireless tag in response to a strength or absence of the one or more

15  signals detected by the first electronic device, the status indicating that the wireless tag and the first

16  electronic device are within…or…outside the predetermined range"; and (4) "transmit[ing] the

17  position of the first electronic device and the status to an external electronic device in response to the

18  status indicating that the wireless tag and the first electronic device are within" or outside of the

19  predetermined range." ('318 Pat., claim 1; *id.*, abstract, 8:58-9:14; Ex. F, Engels Decl. ¶ 52.)

20      35.    These specific requirements, tethered to the language of the claims, produce a more

21  efficient system for the linking, tracking, and locating of objects. (Ex. F, Engels Decl. ¶ 53.) **First**,

22  because the claims specifically require that the "first electronic device" be "associated" with the

23  wireless tag and that the "first set of instructions" be "executed" in order for the first electronic device

24  to complete the recited tasks, bandwidth use and energy consumption is decreased in the system. (Ex.

25  F, Engels Decl. ¶ 53.) For instance, because there are circumstances where the "first set of

26  instructions" is "executed," and other circumstances where it is not, the system is not regularly

27  consuming energy or utilizing bandwidth like the prior art. (Ex. F, Engels Decl. ¶ 53.) Moreover, in

28  the situations where the "first set of instructions" is not executed, the "first electronic device" is not

recording the detection of "one or more signals from the wireless tag," thereby reducing storage constraints and the processing power needed for the device to function. (Ex. F, Engels Decl. ¶ 53.) Additionally, because the claims specifically require that the "first electronic device" be "associated" with the "wireless tag," even when the "first set of instructions" is "executed," the instructions cause the "first electronic device" to communicate with an associated "wireless tag." (Ex. F, Engels Decl. ¶ 53.) Thus, the "first electronic device" is not constantly transmitting to all wireless tags, such as unassociated wireless tags, when the "first set of instructions" is "executed." (Ex. F, Engels Decl. ¶ 53.) Consequently, the system is not slowed down by additional (unnecessary) communications with unassociated wireless tags, thereby increasing the efficiency of the devices. (Ex. F, Engels Decl. ¶ 53.) **Second**, because the "first set of instructions, when executed" cause the "first electronic device" to "automatically" complete its tasks, the system requires no other transitional steps. (Ex. F, Engels Decl. ¶ 53.)

36.     Similarly, claim 1 further recites that a "second electronic device," be "unassociated" with the "wireless tag" and that this "second electronic device" comprise a distinct "second set of instructions." ('318 Pat., claim 1; *id.*, abstract; 27:46-52; Ex. F, Engels Decl. ¶ 54.) Not only must the "second electronic device" be "unassociated" with the wireless tag and "second set of instructions" be "executed" for the second electronic device to "automatically" accomplish the recited tasks, but the claims also specifically recite the functions the "second electronic device" performs with specific information: (1) "detect[ing] one or more signals from the wireless tag"; (2) "determine[ing] a position of the second electronic device"; (3) "determine[ing] an identifier for the wireless tag using the one or more signals from the wireless tag"; and (4) "transmit[ing] the position of the second electronic device and the identifier to an external electronic device." ('318 Pat., claim 1; *id.*, abstract, 27:46-57; Ex. F, Engels Decl. ¶ 54.)

37.     These additional—and specialized— requirements, also function to generate a more efficient system. (Ex. F, Engels Decl. ¶ 54.) **First**, because the claims specifically require that the "second electronic device" be "unassociated" with the wireless tag and that the "second set of instructions" be "executed" in order for the second electronic device to complete the defined tasks, bandwidth use and energy consumption is decreased in the system. (Ex. F, Engels Decl. ¶ 54.) As with

12

the "first electronic device" noted above, there will be circumstances where the "second set of instructions" is "executed," and other circumstances where it is not; thus, the "second electronic device" is also not constantly consuming energy, expending processing power, or utilizing bandwidth like the prior art. (Ex. F, Engels Decl. ¶ 54.) In addition, in the circumstances where the "second set of instructions" is not "executed," the "second electronic device" is also not recording the detection of signals from unassociated wireless tags, thereby reducing storage, processing power, and bandwidth constraints. (Ex. F, Engels Decl. ¶ 54.) **Second**, because claim 1 also requires that the "second set of instructions, when executed" cause the "second electronic device" to "automatically" complete the recited tasks, the system requires no other intermediary steps. (Ex. F, Engels Decl. ¶ 54.)

38.    Claim 2 further requires that the controller within the wireless tags not render the tags "detectable by the second electronic device" until the wireless tag "determine[s] that [it] and the first electronic device are outside the predetermined range." ('318 Pat., claim 2; 27:42-57 ("*once a wireless tag 40 or active device 84 has exceeded a predetermined distance from electronic device 10*, wireless tag 40 or active device 84 is configured to be detectable by multiple radio transceiver systems...allowing the owner of wireless tag 40 or active device 84 to monitor its location even when wireless tag 40 or active device 84 is not in contact with electronic device 10.") (emphasis added); Ex. F, Engels Decl. ¶ 55.)

39.    As a result of the specific rules and requirements recited in claim 2, the system further improves the functionality of the computers involved. (Ex. F, Engels Decl. ¶ 55.) **First**, the system reduces unnecessary communications between wireless tags within a predetermined range of an (associated) "first electronic device" and the (unassociated) "second electronic device." (Ex. F, Engels Decl. ¶ 55.) In particular, because the claim does not "render the wireless tag detectable" by any unassociated second electronic device until it is outside of a predetermined range of a first electronic device, there is no need for the unassociated second electronic device to communicate with the wireless tag at this stage. ('318 Pat., claim 2, 27:42-46; Ex. F, Engels Decl. ¶ 55.) In effect, the unassociated second electronic device ignores the wireless tag. (*Id.*) Consequently, by limiting transmissions to "associated" devices while tags are in-range, the energy usage and consumption

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

required by the second electronic devices and the wireless tags within the network is reduced. (Ex. F, Engels Decl. ¶ 55.) Additionally, because claim 2 eliminates needless communications between the unassociated "second electronic device" and "wireless tag" while the tag is within the predetermined range of a "first electronic device," the "second electronic device" and wireless tag are free to use excess bandwidth that would otherwise be constrained. (Ex. F, Engels Decl. ¶ 55.) Finally, because the second electronic device is not detecting the wireless tag at all times, but rather only when certain conditions are met, the second electronic device is also not recording excess detections, thereby reducing device storage and processing power constraints. (Ex. F, Engels Decl. ¶ 55.) **Second**, and relatedly, because the "second electronic device" is not communicating with the wireless tag while the wireless tag is within a predetermined range of the first electronic device, no transmissions are required between the unassociated "second electronic device" and the "external electronic device" (*e.g.*, the cloud). (Ex. F, Engels Decl. ¶ 55.) Consequently, the energy, processing power, and bandwidth usage by the "second electronic device" is further reduced. (Ex. F, Engels Decl. ¶ 55.) Likewise, because the "second electronic device" is not recording excess transmissions to the "external electronic device," the storage constraints are also lessened. (Ex. F, Engels Decl. ¶ 55.)

40.     Because the claim limitations of the '318 Patent (1) set out meaningful requirements for when devices and tags communicate with one another, thereby limiting the system to rules with specific characteristics, and (2) result in a system that is more efficient than—and, thus, results in improved functionality—over prior art systems, a POSA would not consider the '318 Patent claims to be directed to an abstract idea. (Ex. F, Engels Decl. ¶ 56.)

41.     Even if the '318 Patent claims were fairly characterized as being directed to an abstract idea, the claimed elements, individually and as an ordered combination, recite an inventive concept. (Ex. F, Engels Decl. ¶ 57.) In particular, the claims supply an inventive concept because the specific privacy-preserving, scalable, cloud-based, community-powered system claimed addresses the

technological problems in the prior art regarding lack of privacy, scalability, and efficiency in a non-conventional and non-routine way. (Ex. F, Engels Decl. ¶¶ 57-58.)

42.     As explained above, (*supra* ¶¶ 20-23), there are serious privacy concerns with prior art systems.  For example, prior art systems depend on devices that "regularly transmit[] an interrogation signal to the tags" (Ex. E, Raniere [0057]; Ex. F, Engels Decl. ¶ 59.)  In response, each tag within the system "may generate a response signal in response to an interrogation signal." (Ex. E, Raniere [0061]; Ex. F, Engels Decl. ¶ 59.) This "response may include the unique identification code associated with the RFID tag," allowing devices to identify the unique tag. (Ex. E, Raniere [0061]; Ex. F, Engels Decl. ¶ 59.)  Consequently, a third party using a device that "regularly transmits interrogation signals" may be provided information concerning the tag, such as its existence within communication range of the third party's device, and the "unique identification code associated with the tag" thereby allowing the third party to track and trace tags belonging to other users. (Ex. F, Engels Decl. ¶ 59.) These concerns (and more) were also prevalent in the systems Dr. Engels himself developed. (Ex. F, Engels Decl. ¶ 59.)

43.     The '318 Patent claims, individually and as an ordered combination, recite an inventive concept that addresses these privacy problems in the prior art. (Ex. F, Engels Decl. ¶ 60.) In particular, the '318 Patent claims specifically recite a system comprised of a "first electronic device associated with [a] wireless tag" and a "second electronic device unassociated with the wireless tag." ('318 Patent, claim 1; *id.*, abstract; 18:5-6; 23:66-24:1, 27:42-57; Ex. F, Engels Decl. ¶ 61.) The claimed system then recites specific rules and requirements conditioned on whether a tag is "associated" or "unassociated" with the electronic device. (Ex. F, Engels Decl. ¶ 61.) Specifically, only when the "first electronic device" is "associated" with the wireless tag will it execute a unique "first set of instructions" for performing specific tasks. ('318 Pat., claim 1; *id.*, abstract; 8:58-9:14, 18:5-6; 23:66-24:1, Ex. F, Engels Decl. ¶ 61.) Likewise, only when the "second electronic device" is "unassociated" with the wireless tag will it execute a unique "second set of instructions" for "automatically"   (1)

15

"detect[ing] one or more signals from the wireless tag"; (2) "determine[ing] a position of the second electronic device"; (3) "determine[ing] an identifier for the wireless tag using the one or more signals from the wireless tag"; and (4) "transmit[ing] the position of the second electronic device and the identifier to an external electronic device." ('318 Pat., claim 1; *id.*, abstract, 27:46-57; Ex. F, Engels Decl. ¶ 61.) Because this process happens "automatically," the user of the second electronic device (which is "unassociated" with the wireless tag) is unaware that the transmissions have even happened and need not be involved nor even know that the process occurs. ('318 Pat. claim 1; Ex. F, Engels Decl. ¶ 61.) Consequently, this protects the privacy of users of the "first electronic device" and the safety of their "associated" wireless tags, while still utilizing all the benefits of the community of users in the network. (Ex. F, Engels Decl. ¶ 61.)

44.     Additionally, the claimed system further restricts communications between the "second electronic device" and the "unassociated" tag to when the tag is "outside the predetermined range" of the "first electronic device." ('318 Patent, cls. 1-2; *id.*, abstract, 27:42-57; Ex. F, Engels Decl. ¶ 62.) By limiting detection between the unassociated tag and second electronic device solely to when the tag is "outside the predetermined range" of the "first electronic device", the system further limits the exposure and transmission of private information to unassociated devices (and, potentially, their users). (Ex. F, Engels Decl. ¶ 62.)

45.     Also as described above, prior art systems struggled to function ***efficiently*** and on a ***community-wide scale***. (*Supra* ¶¶ 20-22; Ex. F, Engels Decl. ¶¶ 23, 27-28, 64.) For example, systems prior the '318 Patent comprised devices that "regularly transmit[] an interrogation signal to the tags" within communication range, in order to "maintain[] a list of [tagged] objects nearby." (Ex. E, Raniere [0057]; Ex. F, Engels Decl. ¶ 64.) Because these systems do not limit the time and type of information and communications provided to specific circumstances, they expend excess energy consumption and network bandwidth on communications with tags of no consequence to the device. (*Id.*)  These systems also run into excess storage constraints as the devices (1) record each of these regular transmissions

16

to any tag in range; and (2) must compile lists locally of all "objects nearby (i.e., within communication range)," no matter their relationship to the user.   (Ex. E, Raniere [0057], [0068]; Ex. F, Engels Decl. ¶ 64.) As a further example, prior systems were designed to include only a single user tracking his/her own objects. (*See, e.g.,* Ex. E, Raniere [0043], [0060]; Ex. F, Engels Decl. ¶ 64.) Therefore, a user could only "manag[e] the location of at least one object within a predetermined proximity distance." (Ex. E, Raniere [0043], [0057]; Ex. F, Engels Decl. ¶ 64.)  If, for instance, the object left the predetermined proximity distance, however, the object must "reenter within a predetermined proximity distance threshold" before it can once more be located. (Ex. E, Raniere [0043], [0067]; Ex. F, Engels Decl. ¶ 64.) Thus, these prior systems did not incorporate users (and their devices) within the surrounding community to increase the area in which an owner of a specific object could track and locate their tagged belongings in a unique and specific way. (Ex. F, Engels Decl. ¶ 64.) Instead, the '318 Patent claims are directed to specific scalable, privacy-preserving, cloud-based, community-powered systems and methods that use a network of tags and electronic devices in a manner not well-known, routine, and conventional to address the technological problems in the prior art regarding *efficiency and scalability*. (Ex. F, Engels Decl. ¶¶ 63, 65.)

46.   **First**, by reciting the timing and type of information and communications between the "first electronic device" and the wireless tag, the limitations within claim 1 result in a more efficient, and therefore scalable, system. ('318 Pat., claim 1; abstract; 18:5-7; 23:66-24:1; Ex. F, Engels Decl. ¶¶ 66.)  Specifically, claim 1 requires that the "first electronic device" be "associated" with the "wireless tag." ('318 Patent, claim 1; *id.*, abstract, 18:5-7; 23:66-24:1; Ex. F, Engels Decl. ¶¶ 66.) Moreover, claim 1 requires that the first electronic device contain a unique "first set of instructions." ('318 Patent, claim 1; id., abstract, 8:58-9:14, 9:24-31; Ex. F, Engels Decl. ¶¶ 66.) Not only must this "first set of instructions" be "executed" for the first electronic device to "automatically" accomplish its tasks, but the claims specifically recite the functions the "first electronic device" performs with specific information : (1) "detect[ing] one or more signals from the wireless tag"; (2) "determine[ing]

17

a position of the first electronic device"; (3) "determine[ing] a status of the wireless tag in response to a strength or absence of the one or more signals detected by the first electronic device, the status indicating that the wireless tag and the first electronic device are within…or…outside the predetermined range"; and (4) "transmit[ing] the position of the first electronic device and the status to an external electronic device in response to the status indicating that the wireless tag and the first electronic device are within" or outside of the predetermined range. ('318 Pat., claim 1; *id.*, abstract, 8:58-9:14; Ex. F, Engels Decl. ¶ 66.)

47.     These specific requirements increase the efficiency of the claimed system, thereby also broadening its ability to scale. (Ex. F, Engels Decl. ¶ 67.) In particular, because the claims specifically require that the "first electronic device" be "associated" with the wireless tag and that the "first set of instructions" be "executed" in order for the first electronic device to complete the recited tasks, bandwidth use, processing power, and energy consumption is decreased in the system. (Ex. F, Engels Decl. ¶ 67.) Said another way, because there are circumstances where the "first set of instructions" is "executed," and other circumstances where it is not, the system is not regularly consuming energy or utilizing bandwidth and processing power like the prior art. (Ex. F, Engels Decl. ¶ 67.) This also reduces storage constraints, as the first electronic device is not recording "detect[ions] of one or more signals from the wireless tag," while the "first set of instructions" remains unexecuted. (Ex. F, Engels Decl. ¶ 67.) This reduction in energy consumption, processing power required, bandwidth constraints, and storage constraints allows the system to function more efficiently, thereby increasing its ability to scale. (Ex. F, Engels Decl. ¶ 67.)  Additionally, because the claims specifically require that the "first electronic device" be "associated" with the "wireless tag," even when the "first set of instructions" is "executed," the instructions cause the "first electronic device" to communicate with an associated "wireless tag." (Ex. F, Engels Decl. ¶ 67.) Thus, the "first electronic device" is not constantly transmitting to all wireless tags, such as unassociated wireless tags, when the "first set of instructions" is "executed." (Ex. F, Engels Decl. ¶ 67.) Consequently, the system is not slowed down by additional

18

(unnecessary) communications with unassociated wireless tags, thereby increasing the efficiency of the devices and the scalability of the system. (Ex. F, Engels Decl. ¶ 67.) Furthermore, because the "first set of instructions, when executed," cause the "first electronic device" to complete the recited tasks "automatically", the system does not require any intermediate steps. (Ex. F, Engels Decl. ¶ 67.)

48.     **Second**, by reciting the timing and type of information and communications between the "second electronic device" and the wireless tag, the further limitations within claim 1 result in a more efficient and scalable system as well. (Ex. F, Engels Decl. ¶ 68.) In particular, claim 1 further recites that a "second electronic device," be "unassociated" with the "wireless tag" and that this "second electronic device" comprise a distinct "second set of instructions." ('318 Pat., claim 1; *id.,* abstract; 27:46-51; Ex. F, Engels Decl. ¶ 68.) Not only must the "second electronic device" be "unassociated" with the wireless tag and "second set of instructions" be "executed" for the second electronic device to "automatically" accomplish the recited tasks, but the claims also specifically recite the functions the "second electronic device" performs with specific information: (1) "detect[ing] one or more signals from the wireless tag"; (2) "determine[ing] a position of the second electronic device"; (3) "determine[ing] an identifier for the wireless tag using the one or more signals from the wireless tag"; and (4) "transmit[ing] the position of the second electronic device and the identifier to an external electronic device." ('318 Pat., claim 1; *id.*, abstract, 27:46-57; Ex. F, Engels Decl. ¶ 68.)

49.     In a similar way as the preceding portion of claim 1, these claim 1 requirements increase the efficiency, and therefore scalability of the claimed system. (Ex. F, Engels Decl. ¶ 69.) For example, because the claims specifically require that the "second electronic device" be "unassociated" with the wireless tag and that the "second set of instructions" be "executed" in order for the second electronic device to complete the recited tasks, bandwidth use, energy consumption, and the requisite processing power is decreased in the system. (Ex. F, Engels Decl. ¶ 69.) Again, there will be circumstances where the "second set of instructions" is "executed," and other circumstances where it is not; thus, the "second electronic device" is also not constantly consuming energy or utilizing

19

bandwidth and processing power like the prior art, thereby increasing the efficiency of the system as a whole. (Ex. F, Engels Decl. ¶ 69.) This, in turn, allows the system to better function on a community-wide scale. (Ex. F, Engels Decl. ¶ 69.) Moreover, similar to that of the first electronic device, because claim 1 also requires that the "second set of instructions, when executed" cause the "second electronic device" to "automatically" complete the recited tasks, the system requires no other intermediary steps. (Ex. F, Engels Decl. ¶ 69.) This automatic transmission further results in a network capable of containing an ever-growing number of users (*i.e.*, increased scalability). (Ex. F, Engels Decl. ¶ 69.)

50.     Importantly, claim 1 also specifically notes that the unassociated second electronic device (once its instructions are executed) "transmit[s]" information "to an external electronic device." As discussed above, the specification makes clear that this external electronic device may be the "cloud." (*See e.g.*, '318 Pat., Figs 12-13, 18, 1:31-35, 2:67-3:3, 9:3-7, 12:1-13, 27:52-57; Ex. F, Engels Decl. ¶ 70.) Because claim 1 facilitates the transmission of information by the unassociated "second electronic device" to the cloud, a user of an associated first electronic device is able to further monitor the location of their tag, even when the tag is out-of-range of, and therefore not in contact with, the associated "first electronic device." (Ex. F, Engels Decl. ¶ 70.) Significantly, this greatly increases the scale in which a user may track and locate their objects, because the user may benefit from an (unassociated) second electronic device in the surrounding community when his own device is no longer communicating with the wireless tag. (Ex. F, Engels Decl. ¶ 70.)

51.     **Third**, claim 2 of the '318 Patent explains that the wireless tag includes a "controller" which is "configured" to perform specific functions, including the following three tasks: (1) "monitor signals communicated with the first electronic device"; (2) "determine, in response to a strength or absence of signals communicated with the first electronic device and the wireless tag, that the wireless tag and the first electronic device are within a predetermined range or…outside the predetermined range"; and (3)  "render the wireless tag detectable by the second electronic device in response to

SECOND AMENDED COMPLAINT FOR PATENT
                                                                         INFRINGEMENT

determining that the wireless tag and the first electronic device are outside the predetermined range."

('318 Pat., claim 2; *id*., 12:30-39, 12:40-13:4, Fig. 1B; Ex. F, Engels Decl. ¶ 70.)

52.     Claim 2 also contributes to the efficiency and scalability of the system by only "render[ing] the wireless tag detectable by the [unassociated] second electronic device" when "the wireless tag and the first electronic device are outside the predetermined range." ('318 Pat., claim 2; Ex. F, Engels Decl. ¶ 72.) In particular, when the wireless tag is in-range of an associated first electronic device, data is not needlessly being transmitted and/or exchanged between the wireless tag and an unassociated "second electronic device." (Ex. F, Engels Decl. ¶ 72.) Moreover, by selectively determining when the wireless tag is detectable by a second electronic device, the claim reduces the network bandwidth, energy consumption, processing power, and storage used by the second electronic device. (Ex. F, Engels Decl. ¶ 72.) Furthermore, because the second electronic device does not detect the wireless tag while the wireless tag is "within the predetermined range" of the (associated) first electronic device, the "second electronic device" is not further transmitting information to the "external electronic device" (*i.e.,* the cloud) either, thereby further minimizing storage constraints. (Ex. F, Engels Decl. ¶ 72.) On the other hand, if the wireless tag is outside the predetermined range of an (associated) first electronic device, claim 2 "renders the wireless tag detectable by the [unassociated] second electronic device." ('318 Pat., claim 2; Ex. F, Engels Decl. ¶ 72.) In doing so, claim 2 allows users to monitor the location of a wireless tag, even when that wireless tag is out-of-range of, and therefore not in contact with, an associated first electronic device. (Ex. F, Engels Decl. ¶ 72.) Thus, the language of claim 2 allows for the claimed system to scale to the community-wide level by incorporating (unassociated) second electronic devices to help locate another user's tags exactly (and only) when the user of a first electronic device is unable to do so himself. (Ex. F, Engels Decl. ¶ 72.)

C. *Tile and Its Infringing Activities*

21

53.     Despite its pioneering innovations, Linquet has struggled to obtain significant sales or funding. On information and belief, this is at least partly due to Tile's infringing products and services, which, as described in more detail in § V, below, include substantially the same features as Linquet's innovative    solution,    as    shown,    for    example,    at    the    following    link: https://www.youtube.com/watch?v=zzpkWFhOqIk. Tile's infringing products include, for example and without limitation, the Tile Sticker, Tile Slim, Tile Pro, Tile Mate, and Tile embeddable technology (collectively, "Tile's Tags"), which are designed for use with Tile's App/Software and Tile's cloud, which include, for example, Tile's community find feature. Hereinafter, Tile's Tags, Tile's App/Software, and Tile's cloud, are collectively referred to as the "Tile System."

54.     As described in more detail in § V, below, Tile has infringed and continues to infringe directly, jointly, contributorily, and/or by inducement one or more claims of the '318 Patent by its actions in connection with the Tile System.

55.     Tile's past and ongoing infringement is significant. According to Tile, the Tile System is the "world's best-selling Bluetooth tracker," having sold over 30 million units, which constitute 80% of the U.S. retail market share. https://www.thetileapp.com/en-us/about-tile. Public sources suggest that between 2016 and 2018, Tile generated at least $100 million per year in revenue. https://venturebeat.com/2017/05/16/tile-raises-25-million-and-crosses-10-million-bluetooth-trackers-sold/, https://www.usatoday.com/story/tech/talkingtech/2018/07/24/tiles-customers-swear-and-swear-too/798602002/.

56.     Tile also sells and offers for sale accessories specifically designed for and sold with the Tile System, including, for example, custom adhesives, zip straps, iron-on pockets, and money clips. https://www.thetileapp.com/en-us/products/accessories.

57.     Tile's infringement has been, and continues to be, willful and deliberate.

58.     Tile has known of the '318 Patent at least due to Linquet's own competing products and services (www.linquet.com), Linquet's patent marking (https://linquet.com/patents), and Tile's prosecution of its own intellectual property and general awareness of related patents, including, *e.g.*, the '318 Patent.

59.     On January 27, 2020, Linquet, through counsel, also notified Tile of its infringing conduct.  With this letter, Linquet provided a copy of the '318 Patent and a claim chart specifically describing how the Tile System infringed at least claim 1 of the '318 Patent.  A true and correct copy of this correspondence is attached hereto as Exhibit B.

60.     At a minimum, Tile has actual notice of its infringing conduct as of the date of filing and/or service of this Complaint.

61.     Despite Linquet's best efforts, Tile has so far refused to engage in reasonable and good-faith discussions to resolve this matter outside of litigation.  As a result, and to prevent further harm to itself, Linquet was forced to bring this action.

## V.     COUNT I:  INFRINGEMENT OF U.S. PATENT NO. 10,163,318

62.     Linquet realleges and incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1–61, above.

### A. *Direct Infringement*

63.     Pursuant to 35 U.S.C. § 271(a), Tile has directly infringed—either individually, as part of a joint enterprise, or through the exercise of direction and control over at least one other third party—and is still directly infringing at least claims 1 and 2 of the '318 Patent by at least making and/or using relevant configurations of the Tile System in the United States.

64.     As detailed in the claim chart of Exhibit C, the Tile System satisfies each limitation of claims 1 and 2 of the '318 Patent literally or, at the very least, under the doctrine of equivalents.  On information and belief, Tile makes and/or uses (and has made and/or used) the system recited by claims 1 and 2 of the '318 Patent at least when it tests and/or demonstrates the Tile System.

65.     Linquet has been substantially and irreparably harmed by Tile's direct infringement of at least claims 1 and 2 of the '318 Patent, and will continue to be substantially and irreparably harmed if Tile is not enjoined from its infringing conduct.

66.     Linquet has been and continues to be injured financially and otherwise by Tile's direct infringement of at least claims 1 and 2 of the '318 Patent.  As a result, Tile is liable to Linquet for this harm, including, for example and without limitation, damages in the form of lost profits and a reasonable royalty pursuant to 35 U.S.C. § 284.

23

67.     On information and belief, Tile's direct infringement of at least claims 1 and 2 of the '318 Patent has been and continues to be willful.  As described in § IV.C, above, despite having knowledge of the '318 Patent and its infringing conduct, Tile has and continues to make and use relevant configurations of the Tile System.  As a result, Linquet is entitled to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

**B.  *Induced Infringement***

68.     Pursuant to 35 U.S.C. § 271(b), Tile has indirectly infringed and is still indirectly infringing by actively inducing infringement of at least claims 1 and 2 of the '318 Patent.

69.     With knowledge of the '318 Patent and knowing that the Tile System infringes at least claims 1 and 2 of the '318 Patent (or with willful blindness of that fact), as described in § IV.C, above, Tile has induced and continues to induce its customers and users to directly infringe at least claims 1 and 2 of the '318 Patent by, for example, specifically instructing such customers and users, via its website and/or Tile's App/Software, to make and/or use relevant configurations of the Tile System, as described in the claim chart of Exhibit C.  In so doing, such customers and users put every element of the system recited in at least claims 1 and 2 of the '318 Patent into service, thereby controlling the system as a whole and obtaining benefit from it.  On information and belief, Tile intends to cause infringement by its customers and users.

70.     Linquet has been substantially and irreparably harmed by Tile's induced infringement of at least claims 1 and 2 of the '318 Patent, and will continue to be substantially and irreparably harmed if Tile is not enjoined from its infringing conduct.

71.     Linquet has been and continues to be injured financially and otherwise by Tile's induced infringement of at least claims 1 and 2 of the '318 Patent.  As a result, Tile is liable to Linquet for this harm, including, for example and without limitation, damages in the form of lost profits and a reasonable royalty pursuant to 35 U.S.C. § 284.

72.     On information and belief, Tile's induced infringement of at least claims 1 and 2 of the '318 Patent has been and continues to be willful.  As described in § IV.C, above, despite having knowledge of the '318 Patent and its infringing conduct, Tile has and continues to make and use

relevant configurations of the Tile System.  As a result, Linquet is entitled to increased damages under 35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecution this action under 35 U.S.C. § 285.

### C. *Contributory Infringement*

73.     Pursuant to 35 U.S.C. § 271(c), Tile has indirectly infringed and is still indirectly infringing by contributing to infringement of at least claims 1 and 2 of the '318 Patent.

74.     With knowledge of the '318 Patent and knowing that the Tile System infringes at least claims 1 and 2 of the '318 Patent (or with willful blindness of that fact), as described in § IV.C, above, Tile has contributed and continues to contribute to its customers' and users' direct infringement of at least claims 1 and 2 of the '318 Patent by, for example, selling and/or offering for sale the Tile System.

75.     Each portion of the Tile System constitutes a material part of the invention claimed in at least claims 1 and 2 of the '318 Patent, as described in the claim chart of Exhibit C, and is not a staple article or commodity of commerce suitable for substantial noninfringing uses.  Tile knows and has known that each portion of the Tile System is especially made and/or adapted for a use that constitutes infringement of at least claims 1 and 2 of the '318 Patent, as described in the claim chart of Exhibit C.

76.     Linquet has been substantially and irreparably harmed by Tile's contributory infringement of at least claims 1 and 2 of the '318 Patent, and will continue to be substantially and irreparably harmed if Tile is not enjoined from its infringing conduct.

77.     Linquet has been, and continues to be, injured financially and otherwise by Tile's contributory infringement of at least claims 1 and 2 of the '318 Patent.  As a result, Tile is liable to Linquet for this harm, including, for example and without limitation, damages in the form of lost profits and a reasonable royalty pursuant to 35 U.S.C. § 284.

78.     On information and belief, Tile's contributory infringement of at least claims 1 and 2 of the '318 Patent has been, and continues to be, willful.  As described in § IV.C, above, despite having knowledge of the '318 Patent and its infringing conduct, Tile has and continues to make and use relevant configurations of the Tile System.  As a result, Linquet is entitled to increased damages under

SECOND AMENDED COMPLAINT FOR PATENT
                                                                    INFRINGEMENT

35 U.S.C. § 284 and to attorneys' fees and costs incurred in prosecution of this action under 35 U.S.C. § 285.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Linquet Technologies, Inc. respectfully requests that the Court enter judgment in its favor and against Defendant Tile, Inc., and provide Linquet the following relief:

1.    Order, adjudge, and decree that U.S. Patent No. 10,163,318 is valid, enforceable, and infringed by Tile;

2.    Enter a permanent injunction against Tile enjoining it, its directors, officers, agents, employees, successors, subsidiaries, assigns, and all persons acting in privity or in concert or participation with Tile from making, using, selling, or offering for sale in the United States, or importing into the United States, any and all products and/or services embodying the patented inventions claimed in U.S. Patent No. 10,163,318;

3.    Award Linquet its damages for patent infringement pursuant to 35 U.S.C. § 284 and, to the extent applicable, 35 U.S.C. § 154(d), and pre- and post-judgment interest as allowed by law;

4.    Order, adjudge, and decree that Tile's infringement of U.S. Patent No. 10,163,318 has been deliberate and willful, and award Linquet treble damages under 35 U.S.C. § 284;

5.    Find that this case is "exceptional" under 35 U.S.C. § 285, and award Linquet its costs and reasonable attorney's fees as provided in 35 U.S.C. § 285;

6.    Award such other and further relief as the Court deems just and proper.

## VII.    REQUEST FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Linquet respectfully requests a trial by jury for all issues so triable that are raised herein or which hereinafter may be raised in this action.

SECOND AMENDED COMPLAINT FOR PATENT
INFRINGEMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Dated: October 8, 2021

*/s/ JD Schneider*
R. Trevor Carter (*pro hac vice*)
Reid E. Dodge (*pro hac vice*)
**FAEGRE DRINKER BIDDLE & REATH LLP**
300 North Meridian Street, Suite 2500
Indianapolis, IN 46024-1750
Telephone: (317) 237-0300
Facsimile: (317) 237-1100
Email: trevor.carter@faegredrinker.com
Email: reid.dodge@faegredrinker.com

JD Schneider (*pro hac vice*)
**FAEGRE DRINKER BIDDLE & REATH LLP**
1144 15th Street, Suite 3400
Denver, CO 80202
Telephone: (303) 607-3500
Facsimile: (303) 607-3600
Email: jd.schneider@faegredrinker.com

Helen E. Chacon (CA SBN: 293067)
**FAEGRE DRINKER BIDDLE & REATH LLP**
1950 University Ave, Suite 450
East Palo Alto, CA 94303-2279
Telephone: (650) 324-6700
Facsimile: (650) 324-6701
Email: helen.chacon@faegredrinker.com

SECOND AMENDED COMPLAINT FOR PATENT
INFRINGEMENT